UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
MICHAEL DETOUCHE,

           Plaintiff,                          **OPINION AND ORDER**

           -against-                    17 Civ. 7719 (JCM)

JTR TRANSPORTATION CORP.,

                  Defendant.
--------------------------------------------------------------X

        Plaintiff Michael Detouche ("Plaintiff") brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL") against Defendant JTR Transportation Corporation ("Defendant" or "JTR") alleging employment discrimination, hostile work environment, retaliation and wrongful termination. (Docket No. 1). Before the Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Motion"). (Docket No. 61).  Plaintiff opposed Defendant's Motion, (Docket No. 69), and Defendant replied, (Docket No. 70).  For the reasons that follow, Defendant's Motion is granted in part and denied in part.[1]

## I.  BACKGROUND

### A.  Procedural Background

        On October 9, 2017, Plaintiff commenced this action against Defendant alleging race discrimination, hostile work environment, retaliation and wrongful termination relating to his employment at JTR. (Docket No. 1).[2]  Defendant now moves for summary judgment dismissing

---

[1] This action is before the Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. §636(c) and Fed. R. Civ. P. 73. (Docket No. 44).

[2] Plaintiff's Complaint mentions retaliation in a heading, but does not mention it in any cause of action, nor does the Complaint specifically assert any facts in support of a retaliation claim. (*See* Docket No. 1).  However, Plaintiff's

Plaintiff's Complaint in its entirety, (Docket No. 61), accompanied by a memorandum of law ("Def. Br."), (Docket No. 62-48), a statement of facts pursuant to Local Civil Rule 56.1 ("Def. 56.1"), (Docket No. 62-1), and various supporting affidavits and exhibits, (Docket No. 62). Plaintiff filed a memorandum of law in opposition to Defendant's Motion ("Pl. Br."), (Docket No. 69), accompanied by a counterstatement of facts pursuant to Local Civil Rule 56.1 ("Pl. 56.1"), (Docket No. 69-1), Plaintiff's deposition transcript ("Detouche Dep."), (Docket No. 69-3, Ex. A), and Plaintiff's affidavit, (Docket No. 69-2).[3]  Defendant filed a reply memorandum of law ("Def. Reply"). (Docket No. 70).

## B.  Factual Background

The following facts are gathered from Defendant's 56.1 statement and Plaintiff's 56.1 counterstatement, the exhibits attached to the parties' submissions, and affidavits submitted by the parties in support of their contentions.  The facts are construed in the light most favorable to the non-moving party. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  Unless otherwise noted, the facts are not in dispute.

Plaintiff, a fifty-eight-year-old African American man, worked part-time as a driver for JTR between Navy deployments in the mid-to-late 1990s. (Detouche Dep. at 7, 16, 29).[4]  Subsequently, Plaintiff worked full-time for JTR from May 15, 2014 to May 19, 2016 as a tour bus operator. (Def. 56.1 ¶ 1).  Robert Delventhal ("Delventhal"), JTR's Operations Manager, was Plaintiff's immediate supervisor. (Detouche Dep. at 30).  Delventhal interviewed and hired

---

opposition brief addresses Title VII and NYSHRL retaliation claims. (*See* Pl. Br. at 15-17).  Therefore, the Court will briefly analyze these claims. *See infra*, Section III(E).

[3] Defendant objects to Plaintiff's affidavit on the grounds that it is not properly sworn and notarized. (*See* Def. Reply at 3).  Without ruling on this issue, the Court will disregard Plaintiff's affidavit because the information contained therein is found elsewhere in the record.

[4] All page number citations to the record refer to the ECF page number unless otherwise noted.

Plaintiff. (Def. 56.1 ¶ 3).  JTR is owned by Delventhal's brother, Thomas Delventhal. (Docket No. 62-3 ¶ 1).

While employed full-time at JTR, Plaintiff requested and was granted two leaves of absences. (Def. 56.1 ¶ 10).  Plaintiff took leave from November 19, 2014 to April 9, 2015 and again from February 9, 2016 to March 11, 2016. (*Id.* ¶¶ 11-12).  Plaintiff left the country during his February 2016 leave and did not return to JTR as scheduled. (*Id.* ¶¶ 13-14).  Excluding the time Plaintiff was out on leaves, he worked 3,720 hours, second in hours worked during that time period only to a fifteen-year veteran of the company, who is also African American. (*Id.* ¶¶ 5-6).

## 1.  Race Discrimination and Disparate Treatment Allegations

Plaintiff contends that Robert and Thomas Delventhal made racially discriminatory remarks to him on multiple occasions during his tenure at JTR. (Detouche Dep. at 150-53). Plaintiff testified that the Delventhals made racial slurs about black men, such as, "You're black. You're a criminal. You're going to steal," and "you black guys, big penises." (*Id.* at 151).  On one occasion, a JTR employee's wallet was stolen and Plaintiff testified that the Delventhals "suggested that [he] [had] it" because of his race. (*Id.* at 151-52).  Plaintiff also said that the Delventhals told him: "Your wife [is] from the Philippines.  She's going to come here and sleep with somebody." (*Id*. at 151).  Additionally, Plaintiff testified that when he requested disability leave in May 2016, Delventhal stated that "you people . . . do[] this," and accused him of "trying to go out on disability leave and steal money from [the company]." (*Id.* at 122).

Plaintiff further alleges that black drivers at JTR were assigned to less desirable trips than white drivers. (*Id.* at 97).  Plaintiff defines a desirable trip as, generally, one where drivers can earn more money in less time. (*Id.* at 101-02).  Plaintiff also argues that white drivers were

assigned newer and better running busses and were more likely to be promoted to leadership roles, such as "lead driver" on desirable trips. (*Id.* at 101, 109-10).

Plaintiff additionally testified that in or around fall 2015, he verbally complained to Delventhal that "white drivers [were] getting jobs over black drivers," to which Delventhal responded: "you don't like it, leave." (*Id.* at 127).  Plaintiff asserts that he also complained to Thomas Delventhal via text message in 2016 about race discrimination, to which Thomas Delventhal responded: "get lost." (*Id.* at 129-30).  Plaintiff does not remember specifically when he complained to Thomas Delventhal in 2016 but suggests it "might have" been in May 2016. (*Id.*).  Plaintiff maintains that he no longer has these text messages. (*Id.*).  Moreover, Plaintiff contends that he never filed a written complaint because "there's no organization . . . and if you have a problem, you talk one-on-one with Robert Delventhal." (*Id.* at 131).

Delventhal contends that he never made racially derogatory remarks about or towards Plaintiff. (Docket No. 62-2 ¶¶ 5-6) ("Delventhal Aff.").  He further alleges that Plaintiff never complained to him about discrimination, racism or his bus assignments. (*Id.*).  Thomas Delventhal also denies that Plaintiff complained to him about discrimination or his assignments. (Docket No. 62-3 ¶ 5).  Sheila Prosch ("Prosch"), JTR's office manager, submitted an affidavit in which she maintains that she had "never seen anyone at JTR act in a discriminatory manner or say anything racist," nor had she "known anyone to complain of discrimination or harassment at JTR." (Docket No. 62-5 ¶ 7) ("Prosch Aff.").  Furthermore, twenty-three JTR employees, ranging in tenure from one to eighteen years at JTR, submitted affidavits stating that they had never seen anyone at JTR act in a discriminatory manner or heard anyone complain of discrimination or harassment. (Docket No. 62, Exs. 6-28).

### 2. Random Drug Testing

The U.S. Department of Transportation ("DOT") requires that tour bus operators undergo randomized drug testing. (Def. 56.1 ¶ 16).  Drivers are randomly selected for testing from a DOT pool of drivers with Commercial Driver's Licenses on a quarterly basis. (*Id.* ¶ 17).  JTR neither chooses which employees are drug tested nor administers tests. (*Id.* ¶¶ 20-21).  JTR's drug tests are administered and managed by a third-party, TEK Occupational Services ("TEK"). (*Id.* ¶ 22).  TEK employs a sub-contractor, Lakeshore Employee Testing Services, LLC ("Lakeshore"), to select employees for testing. (*Id.* ¶ 23).

The DOT Office of Drug & Alcohol Policy & Compliance Employee Manual ("DOT Employee Manual"), distributed to JTR employees, prohibits employees from "refusing" a drug test. (Docket No. 62-46, Ex. R at 9 (citing 49 C.F.R. § 40)).  Refusing a test is defined as, in relevant part, "failure to appear for any test after being directed by your employer" to appear. (*Id.* at 17).  The DOT Employee Manual further provides that if an employee refuses a test, "[a] supervisor . . . will immediately remove [the employee] from DOT-regulated safety-sensitive functions," *e.g.*, operating a bus, and the employee "will not be permitted to return to performing [such] functions until" satisfying several criteria. (*Id.* at 17-18).  The DOT Employee Manual explains that "DOT regulations do not address employment actions such as . . . firing" and "[a]ll employment decisions are the responsibility of the employers." (*Id*. at 18).  Further, the JTR Transportation Employee Handbook ("JTR Handbook") provides that refusal to submit to a drug test "has the same consequence of a positive test," specifically "terminat[ion] and referr[al] to a substance abuse professional." (Docket No. 62-35, Ex. G at 41, 43).

On April 5, 2016, Delventhal was informed by TEK that Plaintiff was randomly selected for drug testing for the quarter ending in June 2016. (Def. 56.1 ¶¶ 24-25).  The Vice President of

Lakeshore, Claudia Conglio ("Conglio"), ran a randomization sequence resulting in Plaintiff's selection. (*Id.* ¶ 26).  Conglio did not know Plaintiff or any of the parties involved in this action at the time Plaintiff was selected. (*Id.* ¶¶ 27-28).

### 3.  Plaintiff's May 2016 Request for Disability Leave

Plaintiff requested disability leave in May 2016. (Delventhal Aff. ¶ 20).  The parties dispute when and how Plaintiff requested leave.  Plaintiff alleges that on approximately May 14 or 15, 2016, his physician, Dr. Sasha Ristic, informed him that his MRI results showed an ulnar nerve injury necessitating a break from driving. (Detouche Dep. at 141-42).  Plaintiff alleges that during this visit Dr. Ristic gave him a letter stating that he needed to leave work for six weeks to recover. (*Id.* at 143).  Plaintiff further asserts that "as soon as [he] found out" about his ulnar nerve injury, prior to May 16, 2016, he called Delventhal to tell him that he needed to take disability leave. (*Id.* at 141).  During this call, Plaintiff alleges that Delventhal accused him of lying, made racial slurs and requested that Plaintiff come to his office early the next morning. (*Id.* at 157-59).

Delventhal maintains that Plaintiff did not call him prior to their May 16, 2016 meeting to discuss disability leave. (Delventhal Aff. ¶ 18).  Delventhal contends that on May 16, 2016, at approximately 8:00 A.M., "Plaintiff walked into [his] office" and "told [him] he needed to take leave for at least four weeks to have intensive physical therapy with his doctor related to a car accident he had while off-duty." (*Id.* ¶¶ 17, 20).  Further, Prosch alleges that on the morning of May 16, 2016, Plaintiff told her that "he was going to ask Mr. Delventhal if he could take a leave of absence because he needed to have physical therapy on his arms due to a car accident that he had while driving his mother's car." (Prosch Aff. ¶ 4).  It is undisputed that Plaintiff did not undergo physical therapy between May 16, 2016 and June 27, 2016. (Def. 56.1 ¶ 49).

### 4. The May 16, 2016 Meeting

On the morning of May 16, 2016, Plaintiff met with Delventhal in Delventhal's office. (*Id.* ¶ 32). Delventhal told Plaintiff that he had been randomly selected for a drug test, (*id.* ¶ 33), and called TEK to schedule Plaintiff's test for that afternoon, (*id.* ¶ 34). Plaintiff was present in Delventhal's office when Delventhal attempted to schedule the test. (*Id.* ¶ 35). Delventhal was unable to schedule an appointment with TEK for the afternoon of May 16, 2016 because TEK staff were "on location" and were not answering calls. (*Id.* ¶ 36; Docket No. 62-33, Ex. E). The parties dispute whether Plaintiff and Delventhal agreed that Plaintiff could undergo drug testing when he returned from leave. (Detouche Dep. at 187; Pl. 56.1 ¶ 37). Nonetheless, Delventhal scheduled Plaintiff's drug test for May 19, 2019 at 11:15 A.M. (Docket No. 62-31, Ex. C; Docket No. 62-33, Ex. E).

The parties' descriptions of the May 16, 2016 meeting differ considerably. Plaintiff states that he arrived at Delventhal's office between 5:00 A.M. and 6:00 A.M. on May 16, 2016 when no one else was in the building. (Detouche Dep. at 138-39). He alleges that during this meeting, Delventhal went on a "rampage," accusing him of lying about his need for disability leave, cursing at him and using the racial slur "you people" to refer to black people. (*Id.* at 147-48, 160). Further, Plaintiff claims that Delventhal displayed a gun on his desk to intimidate him, while continuing to scream, curse and use derogatory language. (*Id.* at 160). Plaintiff asserts that later that morning, Delventhal informed him that he needed to sign paperwork before he could depart for disability leave, and it was not until he returned to Delventhal's office after their initial meeting that Delventhal informed him of the drug test. (*Id.* at 186-87). Plaintiff alleges that he was ready and willing to take the drug test on May 16, 2016, but when the test could not be

scheduled for that afternoon, Delventhal told him he could take a "pre-employment" drug test when he returned from leave. (*Id*. at 187).

Delventhal alleges that when Plaintiff came into his office on the morning of May 16, 2016 requesting disability leave, he told Plaintiff "that [he] would be happy to grant his leave, but that [Plaintiff] had been called for a random drug test and that it needed to be done by the end of June." (Delventhal Aff. ¶¶ 20-21). Delventhal contends that he did not "verbally threaten[]" Plaintiff, nor did he "pull[] a gun" on him. (*Id.* ¶ 19). Prosch alleges that she was at her desk on the morning of May 16, 2016, which is located "right outside of" Delventhal's office. (Prosch Aff. ¶¶ 2, 3). She maintains that the conversation "sounded calm" and both men were "talking normally." (*Id.* ¶ 5). Prosch does not recount hearing "either one raise their voice or scream," nor does she recount Delventhal menacing Plaintiff with a gun at any time. (*Id.* ¶ 6).

Delventhal further avers that he told Plaintiff that his leave was conditioned on Plaintiff providing him with a doctor's note corroborating his need for physical therapy and completing the drug test. (Delventhal Aff. ¶ 24). Furthermore, Delventhal states that when he was unable to schedule Plaintiff's drug test for the afternoon of May 16, 2016, he "told Plaintiff that [he] would call and schedule the test first thing in the morning on Tuesday, May 17, 2016," and that he would call Plaintiff regarding "when and where to appear for the test." (*Id*. ¶¶ 29-30). Delventhal contends that Plaintiff agreed to appear for the test before commencing disability leave. (*Id.* ¶ 30). Delventhal further asserts that he "called Plaintiff every hour from 8:00 A.M. to 4:00 P.M. on Tuesday May 17, 2016, as well as on May 18, 2016 to inform him of the test as agreed." (*Id.* ¶ 31). Plaintiff denies that he agreed to take the drug test before commencing his disability leave. (Detouche Dep. at 188-89). He also denies receiving calls from Delventhal on May 17 and 18, 2016. (*Id.* at 193). Finally, Delventhal maintains that Plaintiff never provided

him with a doctor's note, (Delventhal Aff. ¶ 24), while Plaintiff contends that he provided

Delventhal with a letter from his doctor on May 16, 2016, (Detouche Dep. at 145-46).

**5.  Termination**

Plaintiff was in Dutchess County, New York on May 17, 2016. (Def. 56.1 ¶ 39).  On May

18, 2016, Plaintiff flew to the Philippines and informed Delventhal that he was out of the country

and would not be appearing for his drug test. (*Id.* ¶¶ 44, 46).  At that time, Plaintiff's wife (then

fiancée) resided in the Philippines. (*Id.* ¶ 45).  Plaintiff did not appear for the drug test on May

19, 2016. (*Id.* ¶ 48).  Immediately thereafter, Delventhal cancelled the drug test. (*Id.* ¶ 50).  JTR

dropped Plaintiff from its driver roster and terminated his employment at approximately 12:00

P.M. on May 19, 2016. (*Id.* ¶¶ 51-52; Docket No. 62-31, Ex. C at 1).  JTR sent Plaintiff a letter

dated and mailed on May 19, 2016 stating that "[a]ccording to New York State and Federal

Department of Transportation Laws [JTR is] legally obligated to drop any driver off the roster

that fails to appear for a random drug test" and "[a]ccording to the JTR Policy Manuel [sic]

failing to appear for a random drug test will result in termination." (Docket No. 62-31, Ex. C at

1).

**6.  Workers' Compensation and Disability Claims**

Plaintiff alleges that because of his wrongful termination, his treatment by JTR and

Delventhal, and specifically, the gun incident, he suffered and continues to suffer from Post

Traumatic Street Disorder ("PTSD") and mental disabilities including "anxiety, depression,

problems dealing with people, and hallucinations." (Detouche Dep. at 202, 210).

After his termination, Plaintiff filed at least one disability claim with JTR's disability

carrier, Shelter Point Life, alleging an onset of disability on May 17, 2016. (Docket No. 62-39,

Ex. K; Def. 56.1 ¶ 75).  Additionally, Plaintiff brought a workers' compensation case in May

2016 alleging PTSD stemming from his alleged wrongful termination and treatment at JTR. (Def. 56.1 ¶ 76).  Plaintiff filed at least two other workers' compensation cases after his termination, (*id.* ¶ 77), including a case filed on January 1, 2017 alleging that he sustained a work-related "left and right ulnar nerve injury" on May 13, 2016, (Docket No. 62-39, Ex. K; Def. 56.1 ¶ 74).

In or around August 12, 2019, Plaintiff entered into a settlement agreement pursuant to Workers' Compensation Law ("WCL") Section 32 ("Settlement Agreement") with JTR and its insurance carrier, the State Insurance Fund, resolving his workers' compensation claims. (Docket No. 68-39, Ex. K).  The Settlement Agreement is comprised of a Section 32 Waiver Agreement ("Waiver"), an accompanying claimant release ("Release"), and an Indemnity Agreement ("Indemnity").  Pursuant to a provision of the Release, Plaintiff discharged JTR from "all claims and prospective claims addressed in" the Settlement Agreement. (*Id.*).  In consideration of the Settlement Agreement, Plaintiff received $175,000 from Defendant's insurer, the State Insurance Fund. (*Id.*; Def. 56.1 ¶¶ 78-79).  The Settlement Agreement was approved by the Workers' Compensation Board ("WCB") on November 18, 2019. (Def. 56.1 ¶ 81).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A genuine dispute of fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  "A fact is material if it might affect the outcome of the suit under the governing law." *Lindsay v. Ass'n of Prof'l Flight*

*Attendants*, 581 F.3d 47, 50 (2d Cir. 2009).  In reviewing a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).  The Court may not make credibility determinations, weigh the evidence or draw legitimate inferences from the facts. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323.  If the movant meets its burden, the burden then shifts to the non-movant to present evidence sufficient to satisfy every element of the claim. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  Like the movant, the non-movant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment. *See Celotex*, 477 U.S. at 324.  Summary judgment can neither be defeated by conclusory allegations nor "on the basis of conjecture or surmise," *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992); the non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998).  Put differently, the dispute of fact must be "genuine," that is, the record evidence must be such that a reasonable jury could return a verdict for the non-movant. *See Anderson*, 477 U.S. at 248.

Parties moving for and opposing summary judgment in the Southern District of New York must also submit short and concise statements of facts supported by admissible evidence. Local Civ. R. 56.1.  The opposing party must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of summary judgment. *See id.*; *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).

## III.  DISCUSSION

### A.  Waiver

Initially, Defendant argues that Plaintiff's claims are barred by the August 2019 Settlement Agreement. (Def. Reply at 4-6).  In support of its argument, Defendant relies on a provision of the Release stating: "I, Michael DeTouche, understand that I am settling all claims and prospective claims addressed in the proposed [Settlement Agreement] between myself and the insurance carrier and/or employer, and that once the Agreement is approved by the Board . . . the claim(s) cannot be reopened by . . . any . . . party in interest." (Def. Br. at 9 (quoting Docket No. 62-42, Ex. N at 14)).  Plaintiff counters that the Settlement Agreement is "a workers' compensation agreement resolving workers' compensation claims, and not a broad agreement with general release language or even a reference to Plaintiff's pending federal litigation and Title VII claims." (Pl. Br. at 12).

Section 32 of the New York WCL permits parties to enter into agreements settling claims for workers' compensation benefits. N.Y. Workers' Comp. L. § 32.  Section 32 Settlement Agreements consist of multiple, mandatory forms: the Waiver, the Release and where, as here, the agreement leaves medical benefits unresolved, the Indemnity. *Section 32 Waiver Agreements*, N.Y. State Workers' Comp. Bd., http://www.wcb.ny.gov/Section32/ (last visited Dec. 14, 2020).  These documents, collectively referred to for purposes of the present discussion as the Settlement Agreement, once approved by the WCB, constitute a final, binding resolution of an employee's workers' compensation claims. *See* N.Y. Workers' Comp. L. § 32.

A section 32 settlement agreement may also "operate to . . . waive[]" discrimination claims. *See, e.g.*, *Warden v. E.R. Squibb & Sons, Inc.*, 840 F. Supp 203, 208 (E.D.N.Y. 1993). Here, Defendant relies primarily on the language in the Release to support its contention that

Plaintiff waived his right to bring the present claims against JTR. (Def. Br. at 9 (citing Docket No. 62-42, Ex. N at 14)).

"A release is a species of contract and 'is governed by principles of contract law.'" *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir. 2001) (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985) (applying New York law)). Thus, "[u]nder New York law, a release — like any contract — must be construed in accordance with the intent of the parties who executed it." *Golden Pac. Bancorp*, 273 F.3d at 515.  Further, a release will not be given effect to bar a future proceeding unless it contains an "explicit, unequivocal statement of a present promise to release a defendant from liability." *Gillaizeau*, 766 F.2d at 713 (internal quotations omitted).  "Obviously, a release may not be read to cover matters which the parties did not desire or intend to dispose of." *Peterson v. Regina*, 935 F. Supp. 2d 628, 636 (S.D.N.Y. 2013) (quoting *Cahill v. Regan*, 184 N.Y.S. 2d 348, 354 (1959)).  The intent of the parties is "ascertained by a fair and reasonable construction of the [contract's] written words." *Lee v. BSB Greenwich Mortg. Ltd. P'ship*, 267 F.3d 172, 179 (2d Cir. 2001) (internal quotations omitted).

The plain language of the Release, in the context of the Settlement Agreement as a whole, does not demonstrate that the parties intended for Plaintiff to abandon his pending federal action by executing the Settlement Agreement.  Defendant points to a provision of the Release which states that the Settlement Agreement resolves "all claims and prospective claims *addressed in* the proposed [Settlement Agreement]." (Docket No. 62-42, Ex. N at 14 (emphasis added)).  Further, as Defendant notes, (Def. Br. at 9), the Settlement Agreement addresses Plaintiff's workers' compensation claims, including those raised in WC Case G1209196, (Docket No. 62-42, Ex. N at 10).  No portion of the Settlement Agreement references Plaintiff's

Title VII or NYSHRL claims, even though the agreement was executed on August 12, 2019, almost two years after Plaintiff commenced the instant action. (Docket No. 62-42, Ex. N).  By its terms, the Settlement Agreement addresses only Plaintiff's workers' compensation claims and cannot be read as a waiver of Plaintiff's statutory claims. *Cf Warden*, 840 F. Supp. at 205 (granting summary judgment to employer where plaintiff continued to pursue an employment discrimination claim after entering into a section 32 settlement agreement in which he agreed to, *inter alia*: (1) "withdraw the [filed] race discrimination, retaliation and national origin charges with prejudice;" (2) "release[] defendant from any claims he had . . . under federal, state or local laws prohibiting . . . discrimination" and "claims growing out of his employment and its termination . . .;" and (3) refrain from filing "any complaints or charges or lawsuits alleging race or age or national original discrimination against [defendant] . . . at any time [in the future]"). Consequently, the Court finds that the instant matter is not barred by the Settlement Agreement.

## B.  Collateral Estoppel and Double Recovery

Defendant further asserts that Plaintiff's Title VII and NYSHRL claims are precluded by the doctrine of collateral estoppel.[5] (Def. Br. at 7-10).  Collateral estoppel, or issue preclusion, forecloses "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context

---

[5] To the extent that Defendant intends to argue that the Settlement Agreement is barred by the doctrine of *res judicata*, this argument fails. (*See* Def. Br. at 8-10).  Under the doctrine of *res judicata*, or claim preclusion, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Rivet v. Regions Bank of La.*, 522 U.S. 470, 476 (1998).  The concept of *res judicata* applies to settlement agreements. *Greenberg v. Bd. of Governors of Fed. Reserve Sys.*, 968 F.2d 164, 168 (2d Cir. 1992).  "In such cases, the preclusive effect of a settlement is measured by the intent of the parties to the settlement, which is to be determined from the language of the agreement itself." *Gentile v. Potter*, 509 F. Supp. 2d 221, 232 (E.D.N.Y. 2007) (quoting *White v. U.S. Postal Serv.*, No. 04 CV 0602(SJ), 2005 WL 408047, at *3 (E.D.N.Y. Feb. 16, 2005)).  Where the language of a settlement agreement is unambiguous, courts may find that the parties intended the agreement to be a final adjudication of liability. *Gentile*, 509 F. Supp. 2d at 232.  As discussed herein, *supra*, Section III(A), the language of the Settlement Agreement does not demonstrate Plaintiff's intent to abdicate his right to pursue his present claims, which were pending at the time the Settlement Agreement was executed.  Consequently, the Settlement Agreement does not constitute *res judicata*.

of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *N.H. v. Me.*, 532 U.S. 742, 748-49 (2001)).  Although Defendant argues that "Plaintiff's recovery is barred by collateral estoppel," Defendant does not identify any issue litigated and resolved by the workers' compensation judge that it seeks to give preclusive effect in the present action. (*See* Def. Br. 7-10).  In any event, collateral estoppel is not appropriate here.  Collateral estoppel "applies only to issues that have been actually litigated; it does not apply either to issues that were determined without litigation (such as under a settlement agreement) or to those that could have been litigated but were not." *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 377 (S.D.N.Y. 1999).

The gravamen of Defendant's argument is that Plaintiff should be barred from receiving a "double recovery" from JTR. (Def. Br. at 10; Def. Reply at 6).  Defendant contends that Plaintiff should be estopped from bringing the present action because he already recovered money pursuant to the Settlement Agreement based on the events that form the foundation of the present action. (Def. Br. at 8-10).  While courts in this circuit have admonished that a plaintiff cannot recover twice for the same injury, *see, e.g.*, *Sparaco v. Lawler, Matusky, Skelly Engineers LLP*, 313 F. Supp. 2d 247, 250 (S.D.N.Y. 2004), Defendant's argument relates to damages, not liability.[6]  Thus, it is premature at the summary judgment stage for the Court to assess the amount of damages Plaintiff may receive if Defendant is found liable. *See, e.g.*, *Taylor v. Polygram Records*, No. 84 CIV. 7689(CSH), 1999 WL 124456, at *26 (S.D.N.Y. Mar. 8, 1999) ("Since this case has not yet been tried and no award has been made, it would be premature . . . to make a discretionary determination regarding whether or not the unemployment benefits Plaintiff earned should be deducted from any potential back pay award."); *Halo Optical Prod.,*

---

[6] The foregoing discussion should not be construed as the Court rendering a decision on whether, if Plaintiff prevails at trial, any damages that Plaintiff may be awarded should be offset by the monies Plaintiff received pursuant to the Settlement Agreement.  Such a determination is premature.

*Inc. v. Liberty Sport, Inc.*, 6:14-cv-00282 (MAD/TWD), 2017 WL 1082443, at *13 n.5 (N.D.N.Y. Mar. 22, 2017).

Accordingly, the Settlement Agreement does not bar adjudication of the present claims. Finding that Plaintiff's Title VII and NYSHRL claims are not barred, the Court proceeds to the merits of such claims.

## C.  Race Discrimination Under Title VII and NYSHRL

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1) (1994).  Similarly, the NYSHRL makes it an "unlawful discriminatory practice [f]or an employer . . . because of," *inter alia*, "an individual's . . . race, creed, color, [or] national origin . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. EXEC. LAW. § 296(1).  Employment discrimination claims under Title VII and the NYSHRL are reviewed under the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, and are generally addressed together. 411 U.S. 792 (1973); *see also Farmer v. Shake Shack Enters., LLC*, 19 Civ. 9425 (PAE), 2020 WL 4194860, at *6 (S.D.N.Y. July 21, 2020).  "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff." *Reeves*, 530 US. at 143 (internal quotations omitted).

First, a plaintiff must establish a *prima facie* case of discrimination. *See Jones v. Yonkers Pub. Sch.*, 326 F. Supp. 2d 536, 542 (S.D.N.Y. 2004).  If the plaintiff satisfies his *prima facie* burden, a presumption of unlawful discriminated is raised. *Id.*  The burden then shifts to the

employer "to articulate a legitimate, clear, specific and non-discriminatory reason" for the adverse employment action. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). If the defendant satisfies this burden of articulation, plaintiff bears the ultimate burden of showing that the employer's stated reason was a pretext for discrimination. *See Jones*, 326 F. Supp. 2d at 543.

A trial court must exercise caution when granting summary judgment to an employer in a discrimination case when the employer's intent is at issue, as it is here. *See Gallo*, 22 F.3d at 1224. "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found . . . affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.*

## 1. Prima Facie Case

To establish a *prima facie* case of discrimination, Plaintiff must show: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138. Plaintiff's burden in presenting a *prima facie* case is "not onerous," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and is described as *de minimis*, *see, e.g.*, *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009).

Defendant concedes that Plaintiff is a member of a protected class based on his race, and that Plaintiff suffered an adverse employment action: termination. (*See* Def. Br. at 12-15). However, Defendant argues that Plaintiff has not established the second and forth elements of his *prima facie* case: qualification and inference of discriminatory intent. (*Id.*).

### i. Qualification

Defendant argues that Plaintiff's "job performance was unsatisfactory" and thus, Plaintiff cannot establish a *prima facie* showing of discrimination. (*Id.* at 12-13). Specifically, Defendant contends that Plaintiff's performance was unsatisfactory because he took two extended leaves during his tenure at JTR and he failed to meet JTR's drug testing requirements. (*Id.*).

Plaintiff does not need to demonstrate "satisfactory performance" of his job duties to establish his *prima facie* case. *See Herbert v. City of N.Y.*, 748 F. Supp. 2d 225, 237 (S.D.N.Y. 2010) (citing *Holcomb*, 521 F.3d at 138). Instead, Plaintiff need only show that he was "qualified for the position [he] held." *Id*. To satisfy this prong, "Plaintiff need not show perfect performance or even average performance, but only that [he] possesses the basic skills necessary for performance of the job." *Id.* (internal quotations omitted); *accord Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001).

Although the crux of Defendant's argument regarding Plaintiff's unsatisfactory performance is Plaintiff's alleged refusal to submit to a drug test, the Second Circuit has "long emphasized that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (reiterating that the role of the qualification prong is "simply to help eliminate [] the most common nondiscriminatory reasons for the plaintiff's" termination; "[i]t cannot be more than that." (internal quotations omitted)). Thus, if an otherwise qualified employee is alleged to have created circumstances justifying his termination, that conduct is appropriately evaluated when assessing the employer's stated neutral reason and the employee's pretext case. *See Calabro v. Westchester BMW, Inc.*, 398 F. Supp. 2d 281, 289 (S.D.N.Y. 2005).

Applying these standards, Plaintiff has established that he was "qualified" for purposes of his *prima facie* case.  In a wrongful discharge case, "the inference of minimal qualification is . . . easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that [he] is minimally qualified." *Gregory*, 243 F.3d at 696. Plaintiff was hired by JTR, and specifically Delventhal, twice: once as a part-time driver in the mid-to-late 1990s and again as a full-time driver in 2014. (Detouche Dep. at 29-30, 33).  Further, Plaintiff worked as a driver for several other bus companies including First Student Bus, Wade Bus, Academy Bus and Yankee Trails before commencing his 2014 employ at JTR. (*Id*. at 30-33).  Furthermore, Plaintiff worked 3,720 hours in his fifteen-months of full-time employment at JTR, the second most hours worked by any JTR employee within that time period. (Def. 56.1 ¶ 5).  Plaintiff has clearly established that he possessed the basic skills necessary to work as a tour bus operator at JTR.

### ii.  Inference of Discriminatory Intent

The fourth element of Plaintiff's *prima facie* case, whether his termination arose under circumstances giving rise to an inference of discriminatory intent, is also at issue.  For purposes of his *prima facie* case, Plaintiff must adduce evidence supporting the inference that "discriminat[ion] was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in [its] decision." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (emphasis in original).  The necessary inference may be derived from a variety of circumstances, including "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events

leading to the plaintiff's discharge." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009), *superseded by statute on other grounds*.

Plaintiff contends that throughout his tenure at JTR, he was subject to racially discriminatory remarks from Thomas and Robert Delventhal, including racial slurs about black men, such as, "You're black. You're a criminal. You're going to steal," and "you black guys, big penises." (Detouche Dep. at 151).  Plaintiff additionally asserts that white drivers at JTR received more desirable trips and better and newer running buses and were more likely to serve as lead driver on larger trips. (*Id.* at 97, 101-02, 109-11).  Further, Plaintiff alleges that on May 16, 2016, after requesting disability leave, Delventhal screamed and cursed at him, made racially charged remarks and brandished a gun to intimidate him. (*Id.* at 160, 166, 205-06).  Three days later, on May 19, 2016, Plaintiff was terminated. (Def. 56.1 ¶ 52).

Consequently, Plaintiff has satisfied the "low threshold" of showing that a reasonable jury could find that JTR's decision to terminate him was at least partially motivated by Plaintiff's race. *See Lenzi*, 994 F.3d at 107.  Accordingly, Plaintiff has established a *prima facie* case of discrimination.

## 2.  Legitimate, Non-Discriminatory Reason for Plaintiff's Termination

Since Plaintiff established a *prima facie* showing of race-based discrimination, the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. *See Holcomb*, 521 F.3d at 138.  The "defendant must clearly set forth . . . reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotations omitted).  At this stage, the burden on the defendant is one of articulation. *See Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir. 1997).

"[T]he defendant need not persuade the court that it was actually motivated by its proffered reasons." *Id.*

Defendant alleges that it terminated Plaintiff for failing to show up for his scheduled drug test in violation of company and governmental drug testing policies. (Def. Br. at 16-17). "Given the low threshold that the defendant[] must meet," Defendant's proffered reason for Plaintiff's termination is sufficient to rebut the presumption of discrimination raised by Plaintiff's *prima facie* case. *See Griffin v. Ambika Corp.*, No. 98 CIV. 8985(NRB), 2000 WL 968005, at * 11 (S.D.N.Y. July 13, 2000).

### 3. Evidence of Pretext

The burden now shifts back to Plaintiff to offer evidence that would allow a rational juror to conclude that Defendant's purported reason for his termination is pretext for race discrimination. *See Hicks*, 509 U.S. at 507-08. Plaintiff's *prima facie* case, combined with sufficient evidence to conclude that the employer's articulated justification is false, may allow the trier of fact to conclude that the employer discriminated against the plaintiff. *See Reeves*, 530 U.S. at 148. Since Plaintiff established a *prima facie* showing of race-based discrimination, the Court must decide whether Plaintiff adduced sufficient evidence to enable a jury to find that Defendant's stated reason for his termination — his missed drug test — is pretext. *See id*. Furthermore, Defendant's arguments that Plaintiff was not satisfactorily performing his job duties, *see supra*, Section III(C)(1)(i); (Def. Br. at 12), are appropriately considered here, as Defendant's arguments support its stated reason for Plaintiff's termination, and thus relate to the veracity of its proffered reason. *See, e.g.*, *Calabro*, 398 F. Supp. 2d at 289.

First, Defendant argues that Plaintiff's performance was unsatisfactory because he was absent from his position for extended periods of time due to multiple leaves of absences and did

not return from his second leave on time. (Def. Br. at 12).  Plaintiff took leave from November 19, 2014 to April 9, 2015 to recover from injuries he sustained in an off-duty accident, (Def. 56.1 ¶ 11; *see also* Detouche Dep. at 148), and again from February 9, 2016 to March 11, 2016 for personal reasons, (Def. 56. 1 ¶ 12; *see also* Detouche Dep. at 149).  Plaintiff left the country during his February 2016 leave and did not return as scheduled. (Def. 56.1 ¶¶ 13-14).  However, Defendant has not adduced evidence that Delventhal was dissatisfied with Plaintiff because of his requests for leave or that Delventhal expressed his dissatisfaction to Plaintiff.  In fact, Delventhal states that he told Plaintiff that "[he] would be happy to grant his leave" and that "neither [Delventhal], nor JTR, had any issue with Plaintiff taking leave for medical or personal reasons." (Delventhal Aff. ¶¶ 20, 25).  Delventhal further alleges that if Plaintiff had "told him that he . . . wanted time off to go see his girlfriend," he would have temporarily "dropped him from the driving roster and scheduled him for a pre-employment drug test upon his return." (*Id.* ¶ 37).  Furthermore, notwithstanding his leaves, Plaintiff worked the second most hours of any JTR employee in his fifteen months at the company during that time period. (*Id.* ¶ 10; Def. 56.1 ¶ 5).

Second, Defendant asserts that after learning of a federally mandated drug test, Plaintiff requested leave for physical therapy. (Def. Br. at 12).  Defendant also contends that Plaintiff sought leave to either avoid taking the drug test or to go to the Philippines to marry his girlfriend. (*Id.*).  In support of this contention, Defendant points to evidence that Plaintiff told his medical provider, in August 2016,[7] that he was abusing alcohol and narcotics, and that Plaintiff was

---

[7] Defendant contends that Plaintiff "admitted to his medical provider *immediately* after his termination that he was abusing alcohol and narcotics." (Def. Br. at 13(emphasis added)).  However, Plaintiff told his provider he was abusing alcohol and narcotics on August 8, 2016, approximately eleven weeks after his termination. (Docket No. 62-37, Ex. I).

prescribed narcotics for pain before his termination.[8] (Docket No. 62-37, Ex. I) ("Pl. Medical Records").  The record is clear that Plaintiff did not undergo physical therapy between May 16, 2016 and June 27, 2016. (Def. 56.1 ¶ 49).

Furthermore, Defendant avers that irrespective of why Plaintiff refused to submit to the test, his failure to appear violated both federally mandated and company drug testing requirements, necessitating his termination. (Def. Br. at 16).  In support of its assertion, Defendant cites to the Federal Motor Carrier Safety Act Guidelines ("FMCSA Guidelines") on random drug testing, which mandate that "no driver shall refuse to submit to . . . a random alcohol or controlled substances test required under §382.305 . . ." (*Id*. at 16-17 (quoting 49 C.F.R. § 382.305)).

Defendant further maintains that the DOT Employee Manual prohibits employees that perform safety-sensitive functions from refusing a drug test, (DOT Employee Manual at 9), defined as, *inter alia*, failing to appear for a test after being directed by one's employer to appear, (*id.* at 17).  JTR provides the same consequences for failing or refusing to submit to a drug test: termination and referral to a substance abuse program. (JTR Handbook at 41, 43).

Defendant contends that it terminated Plaintiff for refusing a drug test. (Def. Br. at 12).  According to Delventhal, when he was unable to schedule Plaintiff's test for May 16, 2016, he told Plaintiff that he "would . . . schedule the test first thing in the morning on Tuesday, May 17, 2016" and Plaintiff "would receive a phone call as to when and where to appear for the test." (Delventhal Aff. ¶¶ 29-30).  Delventhal maintains that at their May 16, 2016 meeting, Plaintiff

---

[8] The record indicates that Plaintiff was prescribed Hydrocodone-Acetaminophen every 4-6 hours as needed on February 24, 2015, March 25, 2015, May 5, 2015 and June 3, 2015 for pain related to surgery. (Pl. Medical Records).  In August 2016, Plaintiff "claim[ed] to get opiate pain killers and claim[ed] to use 1-2 tablets of hydrocodone or Percocet." (*Id.*; Def. 56.1 ¶ 42).  On or around August 8, 2016, Plaintiff was diagnosed with Alcohol Dependence with Alcohol-induced Mood Disorder. (Pl. Medical Records).  The same medical record "ruled out" a mild Opioid Use Disorder. (*Id.*).

agreed to appear for the drug test and return to JTR with a doctor's note before commencing leave. (*Id.* ¶ 30). Delventhal scheduled Plaintiff's drug test with TEK for 11:15 A.M. on May 19, 2016. (*Id.* ¶ 31; Docket No. 62-33, Ex. E). Delventhal contends that prior to the test, on May 17 and 18, 2016, he called Plaintiff "every hour from 8:00 A.M. to 4:00 P.M.," to inform Plaintiff of the test's location, date and time. (Delventhal Aff. ¶ 31). When Plaintiff did not appear for the May 19, 2016 test, Defendant argues that his termination was appropriate because he "fail[ed] to appear at a federally mandated drug test." (Def. Br. at 16).

In response, Plaintiff asserts that "missing a drug test" was used as a pretext to terminate his employment. (Pl. Br. at 9). Plaintiff contends that he informed Delventhal of his need for disability leave prior to May 16, 2016, (Detouche Dep. at 141), and that he was present and willing to take the test on May 16, 2016, but Delventhal told him that he could take a "pre-employment" drug test when he returned from leave, (*id.* at 187). Plaintiff denies that Delventhal called him hourly on May 17 and 18, 2016, (*id.* at 192), and contends that he received a text message from Delventhal "about scheduling the drug test or reporting to a drug test" to which he replied he was on leave, (*id.* at 193). Finally, Plaintiff maintains that he did not promise to return to JTR with a doctor's note corroborating his need for leave after May 16, 2016. (*See id.* at 145). Instead, he avers that he brought a letter from his doctor to the May 16, 2016 meeting and gave the letter to Delventhal on that day. (*Id.*).

Based on the foregoing, Plaintiff has raised a legitimate dispute as to whether he "refused to submit" to the May 19, 2016 drug test. Specifically, Plaintiff adduced evidence creating a genuine dispute of fact as to whether he received notice of the May 19, 2016 drug test. First, Plaintiff maintains that he was told by Delventhal that he could take a pre-employment drug test when he returned from leave. (*Id.* at 187). Second, Plaintiff disputes that Delventhal called him

hourly between 8:00 A.M. and 4:00 P.M. on May 17 and 18, 2016 to notify him of the test's time and location. (*Id.* at 192-93).  Third, Plaintiff denies that he promised to return to JTR with a doctor's note at the May 16, 2016 meeting and contends that he provided Delventhal with a letter from his doctor at that meeting. (*Id.* at 145).  If Plaintiff was not aware of his upcoming drug test, he could not have "refused" the test, as defined by the FMCSA Guidelines, DOT Employee Manual and JTR Handbook, the violation of which, according to Defendant, justified his termination.

Additionally, Plaintiff proffered evidence supporting his claim that his termination was motivated by racial animus, including: (1) the incident where Delventhal allegedly placed a gun on his desk while chastising Plaintiff and screaming racially charged remarks; (2) derogatory comments allegedly made by JTR management about Plaintiff's race; and (3) allegations that black employees received less desirable trips, older buses, and were less likely to be named lead driver on desirable trips than white drivers.

In conclusion, drawing all inferences in favor of the Plaintiff, the Court finds that a reasonable juror could conclude that JTR's stated reason for Plaintiff's termination is pretextual. *See Manning v. N.Y. Univ.*, No. 98 CIV 300(NRB), 2000 WL 33339614, at *9 (S.D.N.Y. July 28, 2000).  Accordingly, Defendant's motion for summary judgment is denied with respect to Plaintiff's race discrimination claim.

**D.  Hostile Work Environment Under Title VII and NYSHRL**

Hostile work environment claims under Title VII and the NYSHRL are analytically identical. *See, e.g.*, *Massie v. Metro. Museum of Art*, No. 11-CV-9549 (JPO), 2015 WL 3833839, at *6 (S.D.N.Y. June 22, 2015).  To withstand summary judgment, Plaintiff must point to evidence in the record indicating that his "workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Specifically, Plaintiff must adduce evidence that the complained of conduct "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [race]." *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 552-53 (E.D.N.Y. 2015) (quoting *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 233 (E.D.N.Y. 2014)).  Additionally, a plaintiff must establish a specific basis for imputing the hostile work environment to the employer. *See Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 658-59 (S.D.N.Y. 2017).

"Whether the challenged conduct is sufficiently severe or pervasive 'depends on the totality of the circumstances.'" *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (quoting *Harris*, 510 U.S. at 114).  In *Harris*, the Supreme Court established a non-exclusive list of factors to consider, including but not limited to: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 510 U.S. at 23.  The frequency and the severity of the misconduct are the principal focus of the analysis; the last three factors are specific considerations within the severity inquiry. *Aulicino*, 580 F.3d at 82.  The effect of the identified incidents on a plaintiff's well-being, though not dispositive, are also relevant. *Harris*, 510 U.S. at 23.  Moreover, it is well settled in this circuit that even a single act can create a hostile work environment if, by itself, it transforms the plaintiff's workplace, and is "extraordinarily severe." *Cruz v. Coach Stores, Inc.*,

202 F.3d 560, 570 (2d Cir. 2000); *see also Marmol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004).

Plaintiff's hostile work environment claim is predicated on allegations that he was subjected to racial slurs on multiple occasions, denied desirable trips that went to white drivers instead, and threatened with a gun by Delventhal. (Pl. Br. at 6).  Specifically, Plaintiff produced sworn deposition testimony asserting that the Delventhals made racially explicit remarks about black people, and that Delventhal, on at least two occasions, referred to black people as "you people." (*See, e.g.*, Detouche Dep. at 120, 122-23, 154).  Plaintiff alleges that the Delventhals also made racially derogatory remarks about his wife, stating that Filipino women would "come [to the United States] and sleep with somebody." (*Id.* at 151).  Additionally, Plaintiff maintains that more desirable trips and newer and better running buses routinely went to white drivers, as did lead driver roles on desirable trips. (*Id.* at 101-09).  Finally, and crucial to his claim, Plaintiff alleges that at their May 16, 2016 meeting, Delventhal pulled a gun out of his drawer and placed it on his desk while yelling at Plaintiff and using "you people" references. (*Id.* at 160).

Defendant denies Plaintiff's allegations and characterizes them as conjecture, pointing to Plaintiff's lack of evidentiary support for his claims aside from his own deposition testimony. (Def. Br. at 20-21).[9]  Moreover, Defendant contends that Plaintiff was treated well by JTR, evidenced by e-mail exchanges in which Delventhal advanced Plaintiff money, (*id.* at 20; Docket No. 62-32, Ex. D at 5-6), and records indicating that Plaintiff was assigned to more trips and

---

[9] Defendant incorrectly frames Plaintiff's hostile work environment claims as an inquiry into whether Plaintiff was "treated less well than other employees because of [his] [race]." (Def. Br at 20 (quoting *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012))).  The foregoing articulates a plaintiff's burden under the New York City Human Rights Law ("NYCHRL") which is a lesser burden than Plaintiff's burden here, under Title VII and the NYSHRL. *See, e.g.*, *Davis-Bell*, 851 F. Supp. 2d at 671 ("Because the NYCHRL was designed to be broader and more remedial than Title VII and the NYSHRL, a plaintiff bringing a hostile work environment claim [under the NYCHRL] need not meet the Supreme Court's 'severe or pervasive' threshold to be actionable." (internal quotations omitted)).

worked more hours than most other JTR drivers, (Def. Br. at 22; Docket No. 62-29, Ex. A). Defendant also highlights JTR's diverse workforce and the fact that most of JTR's employees are racial minorities. (Def. 56.1 ¶ 4). Furthermore, JTR submitted twenty-three affidavits from current employees attesting that they had never seen or experienced discrimination or harassment at JTR. (Docket No. 62, Exs. 6-28).

With respect to the gun incident, Delventhal denies brandishing a gun during his May 16, 2016 meeting with Plaintiff. (Delventhal Aff. ¶ 19). Defendant contends that regardless of its truth, the alleged gun incident is not relevant to a hostile work environment claim. (Def. Br. at 21). Finally, Defendant asserts that Plaintiff's testimony is unreliable because he was diagnosed with psychosis shortly after his termination and that Plaintiff admitted to his medical provider that he had been hallucinating and having paranoia about his job.[10] (*Id.*).

## 1. Plaintiff Has Demonstrated an Objectively Hostile Working Environment

Plaintiff must show that a reasonable person would have found the conduct he complains of hostile or abusive. *See Littlejohn*, 795 F.3d at 321. If credited by a jury, Plaintiff's contention that Delventhal placed a gun on his desk while "making slurs and derogatory remarks, and cursing and screaming," (Detouche Dep. at 204), alone, is sufficiently severe to have altered the conditions of Plaintiff's working environment for the worse. *See Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997). Indeed, the physically threatening nature of Delventhal's alleged behavior "brings this case over the line separating merely offensive or boorish conduct from actionable . . . harassment." *See Cruz*, 202 F.3d at 571.

---

[10] Plaintiff's medical records confirm that in or around November 29, 2016 he began reporting "psychotic symptoms" which he stated he was previously afraid to disclose "because he did not want to be hospitalized." (Pl. Medical Records). Specifically, Plaintiff told his provider in or around November 29, 2016 that he felt "paranoid . . . that people are out to hurt him" and that he hears "one voice which tells him good and bad things about his job." (*Id.*).

Moreover, the veracity of Plaintiff's account of the May 16, 2016 meeting, like all credibility determinations, is within the sole province of a jury. *See Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).  Any challenges that Plaintiff may have distinguishing delusions or hallucinations from reality are relevant to his credibility and do not discount as a matter of law his testimony that Delventhal threatened him with a gun. *See, e.g.*, *Butler v. Cty. of Northampton*, CIVIL ACTION NO. 14-3733, 2017 WL 3485878, at *4 (E.D. Pa. Aug. 15, 2017), *aff'd sub nom. Butler v. Lamont*, 732 F. App'x 125 (3d Cir. 2018) (denying defendants' motion for summary judgment on the ground that plaintiff did not present evidence in support of his assault allegations aside from "his own deposition testimony, in which he admitted that he was suffering from hallucinations and delusions at the time of the alleged [assault]," because "the issue of whether [Plaintiff] was assaulted . . . should be left to a fact-finder . . ."); *Hurd v. Polverine*, No. 1:12CV02037, 2014 WL 4162149, at *6 (N.D. Ohio Aug. 19, 2014) ("The Court is unaware of any exception carved out for circumstances in which the plaintiff sometimes has difficulty distinguishing reality from his hallucinations.  Whether Plaintiff's account of the facts is to be believed is a question for the jury . . .").

Similarly, with respect to Defendant's contention that the only evidence Plaintiff offers to corroborate the gun incident is found in his deposition, which Defendant characterizes as "self-serving," Rule 56 expressly permits reliance on depositions when opposing summary judgment. Fed. R. Civ. P. 56.  Furthermore, Plaintiff's lack of physical evidence or corroborating witnesses goes to his credibility, which cannot be determined at the summary judgment stage. *Cf Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994) ("[a]ny assessments of credibility and all choices between available inferences are matters to be left for a jury, not matters to be decided by the court on summary judgment.")

Defendant further argues that the phrase "you people" is not sufficient to subvert a motion for summary judgment. (Def. Br. at 21).  "[R]acially ambiguous, sporadic remarks" are not, by themselves, sufficient to show race discrimination, especially when there is insufficient evidence that the statement is "laced with racial innuendo as opposed to a neutral, commonplace effort to identify the group being addressed." *Hill v. City of N.Y.*, 136 F. Supp. 3d 304, 337 (E.D.N.Y. 2015) (internal quotations omitted).  However, phrases such as "you people" may also be interpreted as having a negative racial connotation, especially when a Plaintiff "provide[s] greater specificity as to the context of such phrases usage." *See id.* (internal quotations omitted); *see also Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 53 (S.D.N.Y. 2009) (finding on summary judgment that a reasonable juror may construe statements such as "You people are all the same, you are all thieves" as reflecting discriminatory animus).  Here, Delventhal's alleged statement that "you people" are likely to lie about requiring disability leave, especially in the context of the gun incident, and combined with allegations of other racially charged remarks about black people, permit a reasonable jury to find discriminatory animus behind the use of the phrase "you people." *See Winston*, 633 F. Supp. 2d at 53.

Further, Plaintiff's allegations that the Delventhals made discriminatory remarks about his wife's Filipino heritage are also relevant to his hostile work environment claim.  Remarks targeting members of other minorities, although of limited probative value, may contribute to the overall hostility of the working environment for a minority employee and are properly considered on summary judgment. *See Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997) (finding evidence that other minority employees were subjected to harassment relevant to whether a black police officer experienced a racially hostile or abusive working environment).

Accordingly, Plaintiff has met his burden on summary judgment of showing that a reasonable juror could conclude that JTR's working environment was hostile or abusive.

## 2. Plaintiff Subjectively Perceived the Environment as Hostile

Moreover, Plaintiff adduced evidence that he subjectively perceived his working environment at JTR as hostile. Plaintiff's own testimony is sufficient to demonstrate his subjective belief that JTR was hostile during his tenure. *See Vucinaj v. N.Y.C. Police Dep't*, 18 Civ. 7606 (LGS), 2020 WL 4677597, at *9 (S.D.N.Y. Aug. 12, 2020) (finding that plaintiff subjectively perceived his work environment to be hostile based on plaintiff's testimony). Plaintiff testified that because of his treatment at JTR and the alleged gun incident, he suffered and continues to suffer from severe mental anguish including "high anxiety," depression, problems sleeping and visual and auditory hallucinations, none of which he suffered from before the alleged incident. (Detouche Dep. at 202, 210-12). Although there is no need for a working environment to be psychologically injurious to be actionable, Plaintiff's psychological injuries are relevant to his subjective perception that JTR was hostile. *See Harris*, 510 U.S. at 23. Additionally, Plaintiff testified that in 2015 and 2016 he complained to both Robert and Thomas Delventhal about race problems at JTR, further evidencing that he perceived the environment to be abusive. Consequently, Plaintiff has demonstrated that he actually perceived JTR as hostile during his tenure.

## 3. The Hostile Conduct Occurred Because of Plaintiff's Race

It is axiomatic that a plaintiff must demonstrate that he was subject to hostile or abusive conduct because of a protected characteristic. *See Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) (cautioning that it is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of

discrimination.").  Defendant contends that the alleged gun incident is not relevant to Plaintiff's

hostile work environment claim because Delventhal's alleged conduct was not motivated by

Plaintiff's race. (Def. Br. at 21).  Defendant asserts that even if the gun incident occurred,

although "stupid" and "wicked," it was not discriminatory. (*Id.* (quoting *Desir v. Bd. Of Coop.*

*Educ. Servs. (BOCES) of Nassau Cnty.*, 803 F. Supp. 2d 168, 170 (E.D.N.Y. 2011))).

Defendant's argument fails.  As discussed above, Plaintiff maintains that Delventhal

repeated racial slurs including references to black people as "you people" while threatening him

with a gun.  The Court finds that, if credited, a reasonable jury could conclude that the gun

incident and Plaintiff's treatment at JTR was because of Plaintiff's race.[11]

## 4.  Imputing the Hostile Conduct to JTR

Plaintiff must also establish that the Delventhals' hostile conduct can be imputed to JTR.

*See Lamarr-Arruz*, 271 F. Supp. 3d at 656.  The manner in which hostile conduct is imputed to

an employer differs depending on whether the purported wrongdoer is a victim's "supervisor" or

"co-worker." *Id.* at 658-69.  Alleged harassers are considered supervisors for purposes of a Title

VII or NYSHRL claim if they are "empowered by the employer to take tangible employment

actions against the victim," such as hiring or firing. *Id.* at 659.  When a supervisor's harassment

culminates in a tangible employment action, the employer is held strictly liable for the

supervisor's actions. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

---

[11] Defendant's arguments that Plaintiff failed to establish "a clearly demonstrated nexus to an adverse employment action," and that Plaintiff did not adduce evidence raising "an inference of discrimination or anything close to it" misstate the requisite showing for a hostile work environment claim. (*See* Def. Br. at 20).  Defendant's citations to *Chan v. Donahoe*, 63 F. Supp. 3d 271, 293-94 (E.D.N.Y. 2014) and *Hasemann v. United Parcel Serv. of Am., Inc.*, Civil Action No. 3:11-cv-554 (VLB), 2013 WL 696424, at *6 (D. Conn. Feb. 26, 2013) are misplaced, as these cases discuss race discrimination claims, not hostile work environment claims.  As such, Defendants foregoing contentions are properly addressed in the discussion of Plaintiff's race discrimination claims. *See supra*, Section III(C).

Robert and Thomas Delventhal are both Plaintiff's supervisors.  Plaintiff was hired by, reported to, and was ultimately terminated by Robert Delventhal. (Delventhal Aff. ¶¶ 4, 38).  Thomas Delventhal is the owner of JTR. (Docket No. 62-3 ¶ 1).  Furthermore, viewing the facts in the light most favorable to Plaintiff, the alleged harassment culminated in Plaintiff's termination.  Consequently, JTR is strictly liable for the alleged hostile conduct, and the alleged hostile work environment is properly imputed to JTR. *See Vance*, 570 U.S. at 424.

## 5.  Defendant's Arguments Regarding the Falsity of Plaintiff's Allegations

Defendant argues that "the sheer amount of untruthful statements made by Plaintiff," the conclusory nature of Plaintiff's allegations, and Plaintiff's lack of concrete detail direct summary judgment in Defendant's favor, as a reasonable juror would be prohibited from finding for Plaintiff. (*See* Def. Br. at 22-24).  It is well-accepted that credibility assessments and choices between conflicting versions of events are within the province of a jury and may not be decided by a court on summary judgment. *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 553-54 (2d Cir. 2005).  In rare cases, "where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine . . . whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Id.*  For a district court to question the credibility of a plaintiff on summary judgment, the testimony must be "'so replete with inconsistencies and improbabilities' that no reasonable [fact-finder] would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Id.* at 555 (citing *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 475 (S.D.N.Y. 2003)).  The Second Circuit has clarified that a court's assessment of witness credibility should be confined to "certain extraordinary cases, where the facts alleged are

so contradictory that doubt is cast upon their plausibility." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011).

Such an extraordinary case is not present here.  In *Jeffreys*, the plaintiff brought claims against police officers that he alleged beat him until he was unconscious while arresting him on the third floor of a school building. 275 F. Supp. 2d at 466.  He further alleged that when he regained consciousness, he was lying on the pavement outside of the building. *See id.* at 467. Plaintiff inferred in his complaint that he had been defenestrated by the officers. *Id.*  However, the record revealed that on multiple occasions, the plaintiff told police and correctional officers that he jumped out of the window to evade arrest. *Id.* at 468, 470.  Further, emergency room staff found no evidence of head trauma and determined that the plaintiff never lost consciousness. *Id.* at 469.  Notwithstanding the factual dispute, the district court concluded that no "genuine" issue of fact existed because no reasonable jury could credit plaintiff's allegations. *Id.* at 479.  The Second Circuit affirmed. *See Jeffreys*, 426 F.3d at 554; *see also Rojas*, 660 F.3d at 106 (affirming district court's grant of summary judgment where evidence submitted by plaintiff opposing defendant's summary judgment motion directly contradicted allegations she made in her pleadings and testimony she gave in a related criminal case).  Although Defendant has raised inconsistencies in the record, (Docket No. 62-48 at 20-22), the inconsistences do not rise to the level contemplated by the Second Circuit in *Jeffreys* and *Rojas*, and, therefore, a jury must assess the credibility of Plaintiff's evidence.

In conclusion, viewing the evidence in the light most favorable to the Plaintiff, the Court finds that Defendant is not entitled to summary judgment with respect to Plaintiff's hostile work environment claims.  Accordingly, Defendant's motion for summary judgment is denied with respect to Plaintiff's hostile work environment claims under Title VII and the NYSHRL.

**E.  Retaliation Under Title VII and the NYSHRL**

The Court will briefly address Plaintiff's retaliation claims under Title VII and the NYSHRL.  The *McDonnell Douglas* burden shifting framework also applies to retaliation claims under Title VII and the NYSHRL. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 842 (2d Cir. 2013); *McDuffie v. Eli Lilly & Co.*, No. 04 Civ. 05995(LTS)(HBP), 2009 WL 857069, at *5 (S.D.N.Y. Mar. 31, 2009).  To establish a *prima facie* case of retaliation under either statute, Plaintiff must prove: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) adverse employment action; and (4) a causal connection between plaintiff's protected activity and the adverse action." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir. 2000).  Because Plaintiff failed to adduce evidence establishing a causal connection between his alleged protected activity and his termination, Plaintiff's retaliation claims fail as a matter of law and the Court need not reach the other elements of these claims.

It is well-settled that retaliation claims under Title VII and the NYSHRL, unlike Plaintiff's race discrimination claims, must be proved according to traditional principles of but-for causation. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 539 (S.D.N.Y. 2017).  Thus, to demonstrate causation, Plaintiff must establish that his termination "would not have occurred in the absence of the retaliatory motive." *Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 244 (2015).

Plaintiff correctly states that for purposes of his *prima facie* case, the requisite causal connection "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 1998).  Plaintiff was terminated on May 19, 2016. (Def. 56.1 ¶ 52).  Plaintiff alleges that he complained to Thomas Delventhal in 2016 about "race problems" at JTR. (Detouche Dep. at 129-30).

However, Plaintiff has not adduced any evidence showing that his complaint to Thomas Delventhal was followed closely in time by his termination.  It is not clear from the record when Plaintiff complained to Thomas Delventhal.  Plaintiff contends that he "might have" complained in "May [2016]," but does not state whether his complaint predated his May 19, 2016 termination. (Detouche Dep. at 129-30).

Alternatively, Plaintiff relies on *Reeves* for the proposition that the "falsity of an employer's proffered reason [for a plaintiff's termination] is sufficient evidence for a reasonable juror to infer that the employer's proffered reason is a pretext for intentional retaliation." (Pl. Br. at 16).  However, this proposition addresses the requisite showing for a plaintiff to overcome a defendant's legitimate, non-discriminatory reason for race discrimination. *See Reeves*, 530 U.S. at 147.  At no point does the *Reeves* Court address retaliation. *See generally id.*  Moreover, case law interpreting the NYCHRL is not relevant to Title VII or NYSHRL claims. (*See* Pl. Br. at 16). *Cf Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (the NYCHRL "requires that its provisions 'be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights law, including those laws with provisions comparably-worded to [the NYCHRL] have been so construed.'" (quoting Restoration Act § 7)).

In sum, Plaintiff has not presented any evidence demonstrating a causal connection between his alleged 2016 complaint to Thomas Delventhal and his termination.  Accordingly, Plaintiff's Title VII and NYSHRL retaliation claims fail as a matter of law and are dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part.  Plaintiff's retaliation claims pursuant to Title VII and NYSHRL are

dismissed.  Plaintiff's race discrimination and hostile work environment claims under Title VII and NYSHRL remain.

The Clerk is respectfully requested to terminate the pending motion (Docket No. 61).

Dated:   December 14, 2020
         White Plains, New York

                              **SO ORDERED:**

                              _____
                              JUDITH C. McCARTHY
                              United States Magistrate Judge